FOR PUBLICATION

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| GREGORY R. GABRIEL, *Plaintiff-Appellant*, | No. 12-35458 |
| | D.C. No. 3:06-cv-00192-TMB |
| v. | |
| ALASKA ELECTRICAL PENSION FUND; TRUSTEES OF THE ALASKA ELECTRICAL PENSION FUND; PENSION ADMINISTRATIVE COMMITTEE OF THE ALASKA ELECTRICAL PENSION FUND; APPEALS COMMITTEE OF THE ALASKA ELECTRICAL PENSION FUND; GREGORY STOKES; GARY BROOKS; STEVE BOYD; JOHN GIUCHICI; CHERESA MACLEOD; SCOTT BRINGMANN; DAVID CARLE; JIM FULLFORD; MARY TESCH; KNUTE ANDERSON; MIKE BAVARD; LARRY BELL; VINCE BELTRAMI, *Defendants-Appellees*. | ORDER AND OPINION |

Appeal from the United States District Court
for the District of Alaska
Timothy M. Burgess, District Judge, Presiding

Argued and Submitted
August 14, 2013—Anchorage, Alaska

Opinion filed: June 6, 2014
Opinion withdrawn and new Opinion filed: December 16,
2014

Before: Alex Kozinski, Marsha S. Berzon,
and Sandra S. Ikuta, Circuit Judges.

Order;
Opinion by Judge Ikuta;
Concurrence by Judge Kozinski

## SUMMARY[*]

### Employee Retirement Income Security Act

The panel withdrew its prior opinion, denied petitions for
rehearing and rehearing en banc as moot, and filed a
superseding opinion affirming in part and vacating in part the
district court's summary judgment in favor of Alaska
Electrical Pension Fund and other defendants on claims
(1) that the Fund abused its discretion in denying the plaintiff
benefits under the Alaska Electrical Pension Plan and (2) that
he was entitled to equitable relief under ERISA.

For over three years, the Fund paid the plaintiff monthly
pension benefits he had not earned. When it rediscovered an
earlier determination that the plaintiff had never met the
Plan's vesting requirements, it terminated his benefits.

---

[*] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

The panel affirmed the district court's determination that the plaintiff failed to raise a genuine issue of material fact as to his entitlement to "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) in the form of equitable estoppel or reformation.

The panel rejected the plaintiff's argument that the Fund failed to comply with ERISA procedural requirements or waived its determination that the plaintiff never vested, and therefore affirmed the district court's deference to the Fund's denial of benefits.

Because the district court made its ruling prior to the Supreme Court's decision in *CIGNA Corp. v. Amara*, 131 S. Ct. 1866 (2011), and therefore did not consider the availability of the equitable remedy of surcharge, which the Supreme Court held may be "appropriate equitable relief" for purposes of § 1132(a)(3), the panel vacated the district court's ruling that the plaintiff was not entitled to any form of "appropriate equitable relief." The panel remanded for the district court to reconsider the availability of surcharge in this case, and, if available, whether the plaintiff adequately alleged a remediable wrong.

Concurring, Judge Kozinski wrote that he did not object to the decision to remand for the district court to consider whether the plaintiff was entitled to the equitable remedy of surcharge under *CIGNA Corp. v. Amara*. But on the record before the panel, he seriously doubted that the plaintiff would prevail on such a surcharge claim consistent with the panel's opinion.

## COUNSEL

Jennifer Mary Coughlin, K&L Gates, LLP, Anchorage, Alaska, for Plaintiff-Appellant.

Allen Bruce McKenzie (argued), and Frank J. Morales, McKenzie Rothwell Barlow & Coughran, P.S., Seattle, Washington, for Defendants-Appellees.

## ORDER

The opinion filed on June 6, 2014, and appearing at 755 F.3d 647, is withdrawn. The superseding opinion will be filed concurrently with this order. The parties may file additional petitions for rehearing or rehearing en banc.

## OPINION

IKUTA, Circuit Judge:

Gregory R. Gabriel appeals the district court's dismissal of his claims against the Alaska Electrical Pension Fund (the Fund) and other defendants under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 et seq. We affirm the district court's determination that Gabriel failed to raise a genuine issue of material fact as to his entitlement to "appropriate equitable relief" under 29 U.S.C. § 1132(a)(3) in the form of equitable estoppel or reformation. We also reject Gabriel's argument that the Fund failed to comply with ERISA procedural requirements or waived its determination that Gabriel never vested, and therefore affirm

the district court's deference to the Fund's denial of benefits. But, because the district court made its ruling prior to the Supreme Court's decision in *CIGNA Corp. v. Amara*, the district court did not consider the availability of the "monetary remedy against a trustee, sometimes called a 'surcharge,'" which the Court held may be "appropriate equitable relief" for purposes of § 1132(a)(3). 131 S. Ct. 1866, 1880 (2011). Accordingly, we vacate the district court's ruling that Gabriel is not entitled to any form of "appropriate equitable relief" and remand for the district court to reconsider the availability of surcharge in this case, and, if available, whether Gabriel has adequately alleged a remediable wrong.

I

For over three years, the Fund paid Gabriel monthly pension benefits he had not earned. This case arises from the events that occurred after the Fund discovered this error.

From August 1968 through April 1975, Gabriel participated in the Alaska Electrical Pension Plan (the Plan). The Plan is an "employee pension benefit plan" as defined in ERISA, 29 U.S.C. § 1002(2)(A). It covers electrical workers and contractors who work for employers that participate in one of several electrical industry collective bargaining agreements. The Plan is administered by the Fund, which is run by a board of trustees. The Plan gives the trustees "the exclusive right to construe the provisions of the Plan and to determine any and all questions arising thereunder or in connection with the administration thereof."

Under section 5.01 of the Plan, a participant who has completed ten or more "[y]ears of service," as defined in the

Plan, is vested under the Plan and is eligible to apply for pension benefits on retirement after reaching a specified age. Section 8.01 provides that a participant who fails to earn a total of 500 hours of service in a two-year period, and is not on a qualifying leave of absence pursuant to section 8.02, is terminated from the Plan. A terminated participant may be reinstated under section 8.04. Under section 8.03, a vested participant who is terminated is not devested; once vested, a participant remains vested.

Gabriel worked until April 1975 as an employee of several different electric companies that participated in the Plan. In 1975, he became the sole proprietor of Twin Cities Electric. From September 1975 through November 1978, Twin Cities made contributions for both Gabriel and its employees. Based on these contributions, the Fund initially credited Gabriel with eleven years of service, enough to qualify Gabriel as a vested participant under section 5.01.

But in 1979, the Fund determined that Gabriel was an owner of Twin Cities, rather than an employee, and therefore not eligible to participate in the Plan. In a letter dated November 20, 1979, the Fund's general counsel informed Gabriel about this error and told him that the Fund owed him a refund of $13,626 for the erroneous contributions made on his behalf from 1975 to 1978. Further, the letter informed Gabriel that he was terminated from the Plan as of January 1, 1978, pursuant to section 8.01, because its records showed that by that time he had two consecutive years with less than 500 hours of service. An attachment to the letter, entitled "Benefit Statement *Without* Hours Reported By Twin Cities," stated that Gabriel had "8 yrs. Credited Service" from 1968 to 1975 when the improper hours for his time as an employer at Twin Cities were excluded, and that the Fund would update

Gabriel's hours report to remove the improperly credited hours.

As a separate matter, the letter stated that, because Twin Cities had been delinquent in making contributions for its other employees, the Fund would set off the delinquent amounts owed to the Fund (a total of $6,989.24) from the refund amount owed Gabriel, for a total refund to Gabriel of $6,636.76.

On December 3, 1979, the Fund drafted a follow-up letter stating that Twin Cities actually owed more in delinquent obligations than the Fund originally had calculated. To satisfy Twin Cities' delinquent obligations for its employees, the Fund intended to withhold $12,982.69, instead of $6,989.24. Therefore, the Fund would give Gabriel a refund of only $643.31. The letter enclosed a release agreement, which documented the terms of the setoff and refund. It also informed Gabriel about the steps he would have to take to become vested in the Plan. The record includes only an unsigned copy of this letter, which was found in the Fund's files. Gabriel asserts he never received this letter.

In January 1980, Gabriel signed the release agreement, in which he acknowledged that he was receiving a refund of $643.31 arising from "the improper employer contributions paid from the year 1975 through 1978" made on his behalf when he was the owner of Twin Cities, and that the remainder of the improper contributions (amounting to $12,982.69) would be used to pay delinquent obligations.

Gabriel did not meet any of the requirements under the Plan for reinstatement and so never vested in the Plan. Nevertheless, in late 1996, Gabriel asked the Fund for

information about the amount of pension benefits he would receive if he retired. In a letter dated January 6, 1997, a pension representative for the Fund stated that it had calculated Gabriel's pension benefits based on his years of service from 1968 to 1978, and determined that, if he retired, Gabriel would receive pension benefits of $1,236 each month.

Gabriel subsequently retired and applied for benefits, which he began receiving in March 1997. In an affidavit submitted as part of this litigation, Gabriel stated that he would not have retired in 1997 if the pension representative had informed him he was ineligible to receive pension benefits.

The sequence of events leading the Fund to rediscover its error and terminate Gabriel's benefits began in May 2000. At that time, Gabriel began working part-time as an OSHA safety inspector for Udelhoven Oilfield Services to supplement his retirement income. In 2001, the Fund warned Gabriel that his work constituted prohibited post-retirement employment in the industry, which could lead to a suspension of benefits. Although Gabriel argued that his employment at Udelhoven was not in the same industry, the Fund nonetheless suspended his benefits on that basis in November 2001.

Gabriel challenged this suspension of benefits through the administrative process established in the Plan. First, Gabriel appealed the suspension to the Appeals Committee. The Committee denied his appeal, and Gabriel appealed again to the next administrative level, which required arbitration of the dispute. The arbitrator reversed the Appeals Committee's decision and remanded the issue for further fact finding.

At the remand hearing before the Appeals Committee, Gabriel learned that the Fund had not provided him with certain relevant Plan amendments. The Appeals Committee suspended the hearing to give Gabriel an opportunity to review the amendments. Before the Appeals Committee ruled on the dispute, Gabriel stopped working for Udelhoven, and the Fund reinstated his pension benefits as of July 1, 2004.

Gabriel nevertheless continued to pursue his claim against the Fund, and demanded payment of the benefits that the Fund had withheld due to his Udelhoven work, as well as attorney's fees and costs incurred in the administrative appeals process. The parties engaged in settlement negotiations, and the Fund agreed to reimburse Gabriel's attorney's fees and costs. After further negotiations, the Fund also offered to pay Gabriel the withheld benefits, with interest.

Before Gabriel could respond to this offer, however, the Fund revoked it. The Fund rediscovered its earlier determination that Gabriel had been ineligible to participate in the Plan between September 1975 and November 1978, and therefore had never met the Plan's vesting requirements. Because Gabriel had never become eligible for retirement benefits, the Fund terminated Gabriel's benefits and threatened to seek reimbursement for the $81,033 in benefits Gabriel had previously received.[1]

---

[1] The Fund initially brought a counterclaim for reimbursement of these benefits against Gabriel in this litigation, but later voluntarily dismissed it.

In response, Gabriel brought an ERISA action in district court against the Fund, the Board of Trustees, the Pension Administrative Committee (comprised of trustees responsible for deciding benefit claims), the Appeals Committee, and various other individuals responsible for administering the Fund. In his complaint, Gabriel brought claims for recovery of benefits and clarification of rights to future benefits under 29 U.S.C. § 1132(a)(1)(B), and breach of the fiduciary duties set forth in 29 U.S.C. § 1104(a)(1)(A)–(B) and § 1109 under § 1132(a)(3).**[2]** The complaint also alleged misrepresentation and estoppel based on written and oral representations, as well as other claims not relevant here. The defendants moved for summary judgment on all of Gabriel's claims.

The district court addressed the defendants' motion for summary judgment in a series of orders. In its first order, the district court held that Gabriel had raised a genuine issue of material fact as to whether he had satisfied the Plan's vesting requirements, and therefore denied the defendants' summary judgment motion on Gabriel's claims under § 1132(a)(1)(B) for retroactive reinstatement of his monthly pension benefits to November 2001, and clarification of his rights to future benefits. The district court remanded this claim to the Appeals Committee so Gabriel could exhaust his administrative remedies. The district court rejected Gabriel's claim that the defendants were equitably estopped from denying him future pension benefits and granted summary judgment to the defendants on this claim.

---

**[2]** The complaint also alleged claims for breach of co-fiduciary duties set forth in 29 U.S.C. § 1105(a), under 29 U.S.C. § 1132(a)(3), but because these claims are derivative of his breach of fiduciary duty claims, we do not discuss them separately.

On remand before the Appeals Committee, Gabriel no longer argued that he had satisfied the Plan's vesting requirements, but argued that his pension benefits should be reinstated because he had relied to his detriment on the 1997 determination by the pension representative that he was eligible for those benefits. The Appeals Committee rejected this claim, finding that Gabriel was properly informed of the ten-year vesting requirement in the Fund's letters to him of November 20 and December 3, 1979. It also held that, even if Gabriel relied to his detriment on the pension representative's statements, he was not entitled to have those benefits reinstated in violation of the express terms of the Plan.

In its second order, the district court rejected Gabriel's claims under § 1132(a)(3)(B) that he was entitled to equitable relief due to the Fund's breaches of fiduciary duty. The court first held that although Gabriel stated he was seeking equitable relief, such as disgorgement of profits, equitable restitution, and the imposition of a constructive trust, he was actually seeking compensatory damages: the benefits he believed were owed to him. The court rejected this claim, holding that *Mertens v. Hewitt Assocs.*, 508 U.S. 248 (1993), foreclosed such relief against the Fund. Further, although the Ninth Circuit had carved out an exception to *Mertens*'s limit on equitable remedies when a plaintiff alleges facts showing fraud or wrongdoing, *see Carpenters Health & Welfare Trust for S. Cal. v. Vonderharr*, 384 F.3d 667, 672 (9th Cir. 2004), the court determined that Gabriel was not entitled to restitution or the imposition of a constructive trust under this exception because he had failed to show any fraud by the Fund.

In its third order, the district court held that it would review the Appeals Committee's final denial of benefits under an abuse of discretion standard, because the Plan provided the trustees with broad discretion to construe the terms of the Plan. The court rejected Gabriel's claim that the Fund had waived its argument that he did not satisfy the Plan's vesting requirement, as well as Gabriel's argument that the Fund breached its obligation to inform him that he was non-vested in 1979. Under its deferential standard of review, the district court concluded that the Appeals Committee's determination that Gabriel had been properly informed of the ten-year vesting requirement in the letters of November 20 and December 3, 1979, was not clearly erroneous. The court therefore granted summary judgment in favor of the defendants on Gabriel's benefits claim.

After the district court resolved all his claims, Gabriel timely appealed. We review a district court's grant of summary judgment de novo, and must determine, viewing the evidence in the light most favorable to the non-moving party, whether there are any genuine issues of material fact. *Tremain v. Bell Indus., Inc.*, 196 F.3d 970, 975–76 (9th Cir. 1999). We review de novo the district court's conclusion that an ERISA fiduciary did not abuse its discretion. *Winters v. Costco Wholesale Corp.*, 49 F.3d 550, 552 (9th Cir. 1995).

II

We begin by considering Gabriel's argument that the defendants violated their fiduciary duties under ERISA or the

terms of the Plan, for which he is entitled to "appropriate equitable relief" under § 1132(a)(3).**³**

## A

The civil enforcement provisions of ERISA, codified in § 1132(a), are "the exclusive vehicle for actions by ERISA-plan participants and beneficiaries asserting improper processing of a claim for benefits." *Pilot Life Ins. Co. v. Dedeaux*, 481 U.S. 41, 52 (1987). Courts may not "infer [additional] causes of action in the ERISA context, since that statute's carefully crafted and detailed enforcement scheme provides 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.'" *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 254 (1993) (quoting *Mass. Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146–47 (1985)). Under ERISA, the issue is not whether the statute bars a particular cause of action, but rather "whether the statute affirmatively *authorizes* such a suit." *Id.* at 255 n.5.

---

**³** Section 1132(a)(3) provides in pertinent part:

> (a) Persons empowered to bring a civil action
>
> A civil action may be brought— . . .
>
> (3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan . . . .

29 U.S.C. § 1132(a)(3).

Section 1132(a)(3) provides that "[a] civil action may be brought . . . (3) by a participant, beneficiary, or fiduciary . . . (B) to obtain other appropriate equitable relief (i) to redress [any act or practice which violates any provision of this subchapter or the terms of the plan] or (ii) to enforce any provisions of this subchapter or the terms of the plan." 29 U.S.C. § 1132(a)(3). Under this provision, a plaintiff who is a "participant, beneficiary, or fiduciary" must prove both (1) that there is a remediable wrong, *i.e.*, that the plaintiff seeks relief to redress a violation of ERISA or the terms of a plan, *see Mertens*, 508 U.S. at 254; and (2) that the relief sought is "appropriate equitable relief," 29 U.S.C. § 1132(a)(3)(B). A claim fails if the plaintiff cannot establish the second prong, that the remedy sought is "appropriate equitable relief" under § 1132(a)(3)(B), regardless of whether "a remediable wrong has been alleged." *Mertens*, 508 U.S. at 254.

The Supreme Court has made clear that "appropriate equitable relief" refers to a "remedy traditionally viewed as 'equitable.'" *Id.* at 255; *see also CIGNA Corp. v. Amara*, 131 S. Ct. 1866, 1878 (2011) (stating that "the term 'appropriate equitable relief'" in § 1132(a)(3) refers to "'those categories of relief' that, traditionally speaking . . . 'were *typically* available in equity.'" (quoting *Sereboff v. Mid Atl. Med. Servs., Inc.*, 547 U.S. 356, 361 (2006))). Because "ERISA abounds with the language and terminology of trust law," *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 110 (1989), the Court relies heavily on trust law doctrine in interpreting ERISA, *see, e.g.*, *Conkright v. Frommert*, 559 U.S. 506, 512 (2010) (stating that, when "ERISA's text does not directly resolve the matter," the Court has "looked to 'principles of trust law' for guidance" (quoting *Firestone*, 489 U.S. at 109)).

In interpreting § 1132(a)(3), the Court has distinguished between equitable and legal relief. According to the Court, Congress intended to limit the relief available under § 1132(a)(3) to "those categories of relief that were *typically* available in equity (such as injunction, mandamus, and restitution, but not compensatory damages)," *Mertens*, 508 U.S. at 256, and did not authorize any legal remedies, even though an equity court was empowered to grant such relief, *id.* at 256–59. Accordingly, in *Mertens* the Court rejected the plaintiffs' efforts to seek money damages to remedy alleged breaches of fiduciary duty. *Id.* at 255. Further, the Court held that plaintiffs may not disguise an attempt to obtain monetary relief as a traditional equitable remedy. For example, "an injunction to compel the payment of money past due under a contract, or specific performance of a past due monetary obligation, was not typically available in equity," and thus is not available under § 1132(a)(3). *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210–11 (2002). And although restitution can be an equitable remedy, "not all relief falling under the rubric of restitution is available in equity." *Id.* at 212. For instance, a plaintiff "had a right to restitution *at law* through an action derived from the common-law writ of assumpsit." *Id.* at 213. But "a plaintiff could seek restitution *in equity*" only "where money or property identified as belonging in good conscience to the plaintiff could clearly be traced to particular funds or property in the defendant's possession." *Id.*

While ruling out legal remedies and limiting the availability of injunction, mandamus, and restitution in *Mertens* and *Great-West Life*, the Supreme Court has noted that an ERISA lawsuit "by a beneficiary against a plan fiduciary (whom ERISA typically treats as a trustee) about the terms of a plan (which ERISA typically treats as a trust)"

is the sort of action "that, before the merger of law and equity," could have been brought "only in a court of equity, not a court of law." *Amara*, 131 S. Ct. at 1879. Noting that "the remedies available to those courts of equity were traditionally considered equitable remedies," *id.*, the Supreme Court identified three types of such traditional equitable remedies that may be available under § 1132(a)(3), *id.* at 1879–80.

First, "appropriate equitable relief" may include "the reformation of the terms of the plan, in order to remedy the false or misleading information" provided by a plan fiduciary. *Amara*, 131 S. Ct. at 1879. The power to reform contracts is available only in the event of mistake or fraud. *Id.*; *see also Skinner v. Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1166 (9th Cir. 2012). A plaintiff may obtain reformation based on mistake in two circumstances: (1) "if there is evidence that a mistake of fact or law affected the terms of [a trust] instrument and if there is evidence of the settlor's true intent"; or (2) "if both parties [to a contract] were mistaken about the content or effect of the contract" and the contract must be reformed "to capture the terms upon which the parties had a meeting of the minds." *Skinner*, 673 F.3d at 1166. Under a fraud theory, a plaintiff may obtain reformation when either (1) "[a trust] was procured by wrongful conduct, such as undue influence, duress, or fraud," or (2) a "party's assent [to a contract] was induced by the other party's misrepresentations as to the terms or effect of the contract" and he "was justified in relying on the other party's misrepresentations." *Id.*

Second, "appropriate equitable relief" may include the remedy of equitable estoppel, which holds the fiduciary "to what it had promised" and "'operates to place the person

entitled to its benefit in the same position he would have been in had the representations been true.'" *Amara*, 131 S. Ct. at 1880 (quoting James W. Eaton, *Handbook of Equity Jurisprudence* § 62, at 176 (1901)). Under this theory of relief:

> "(1) the party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury."

*Greany v. W. Farm Bureau Life Ins. Co.*, 973 F.2d 812, 821 (9th Cir. 1992) (quoting *Ellenburg v. Brockway, Inc.*, 763 F.2d 1091, 1096 (9th Cir. 1985)); *see also* 1 John Norton Pomeroy, *A Treatise on Equity Jurisprudence* § 805, at 190–98 (5th ed. 1941).

A plaintiff seeking equitable estoppel in the ERISA context must meet additional requirements.[4] First, we have consistently held that a party cannot maintain a federal

---

[4] Although our cases have sometimes discussed equitable estoppel claims as if they were independent causes of action, *see, e.g.*, *Greany*, 973 F.2d at 821, the Supreme Court has now clarified that courts may not "infer causes of action in the ERISA context" beyond what is set forth in the statute, and has instructed us to analyze equitable estoppel as a form of "appropriate equitable relief" under § 1132(a)(3)(B), *Mertens*, 508 U.S. at 254. But because our estoppel precedent relied on traditional equitable principles, *see United States v. Ga.-Pac. Co.*, 421 F.2d 92, 96 (9th Cir. 1970) (citing 3 Pomeroy, *Equity Jurisprudence* §§ 801–02, 804, and *Lavin v. Marsh*, 644 F.2d 1378, 1382 (9th Cir. 1981)), it continues to inform our understanding of what constitutes "appropriate equitable relief."

equitable estoppel claim in the ERISA context when recovery on the claim would contradict written plan provisions. *Greany*, 973 F.2d at 822 (non-trust fund defendants); *Davidian v. S. Cal. Meat Cutters Union & Food Emps. Benefit Fund*, 859 F.2d 134, 136 (9th Cir. 1988) (trust fund defendant). This principle is derived from ERISA's requirement that "[e]very employee benefit plan shall be established and maintained pursuant to a written instrument." 29 U.S.C. § 1102(a)(1). The purpose of this requirement is to protect "the plan's actuarial soundness by preventing plan administrators from contracting to pay benefits to persons not entitled to them under the express terms of the plan." *Rodrigue v. W. & S. Life Ins. Co.*, 948 F.2d 969, 971 (5th Cir. 1991); *see also Greany*, 973 F.2d at 822 (citing *Rodrigue*, 948 F.2d at 971). Accordingly, a plaintiff may not bring an equitable estoppel claim that "would result in a payment of benefits that would be inconsistent with the written plan," or would, as a practical matter, result in an amendment or modification of a plan, because such a result "would contradict the writing and amendment requirements of 29 U.S.C. §§ 1102(a)(1) and (b)(3)." *Greany*, 973 F.2d at 822. For the same reason, "oral agreements or modifications cannot be used to contradict or supersede the written terms of an ERISA plan." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 986 n.2 (9th Cir. 1997); *see also Thurber v. W. Conf. of Teamsters Pension Plan*, 542 F.2d 1106, 1109 (9th Cir. 1976) (per curiam) (holding in an analogous context that an employee's reliance on advice from a pension administrator did not estop the pension fund from denying benefits because "[t]he rights of other pensioners must be considered, and the trust fund may not be deflated because of the misrepresentation or misconduct of the Administrator of the fund"). The same rule applies to informal written interpretations of an ERISA plan. *See Nat'l*

*Cos. Health Benefit Plan v. St. Joseph's Hosp.*, 929 F.2d 1558, 1572 (11th Cir. 1998) (holding that "use of the law of equitable estoppel to enforce informal written interpretations will not undermine the integrity of ERISA plans"), *abrogated on other grounds by Geissal v. Moore Med. Corp.*, 524 U.S. 74 (1998). Nevertheless, we have distinguished "between oral statements that contradict or supersede the terms of an ERISA plan and oral interpretations of a plan's provisions that are not contrary to the plan's written provisions," and may give effect to interpretations of ambiguous plan provisions. *Richardson*, 112 F.3d at 986 n.2.

Second, we have held that an ERISA beneficiary must establish "extraordinary circumstances" to recover benefits under an equitable estoppel theory. *Pisciotta v. Teledyne Indus., Inc.*, 91 F.3d 1326, 1331 (9th Cir. 1996) (per curiam). "The actuarial soundness of pension funds is, absent extraordinary circumstances, too important to permit trustees to obligate the fund to pay pensions to persons not entitled to them under the express terms of the pension plan." *Phillips v. Kennedy*, 542 F.2d 52, 55 n.8 (8th Cir. 1976); *see also Rosen v. Hotel & Rest. Emps. & Bartenders Union of Phila.*, 637 F.2d 592, 598 (3d Cir. 1981). Although we have not defined "extraordinary circumstances" in this context, courts have held that making "a promise that the defendant reasonably should have expected to induce action or forbearance on the plaintiff's part," *Devlin v. Empire Blue Cross & Blue Shield*, 274 F.3d 76, 86 (2d Cir. 2001), as well as "conduct suggesting that [the employer] sought to profit at the expense of its employees," a "showing of repeated misrepresentations over time," or evidence "that plaintiffs are particularly vulnerable," *Kurz v. Phila. Elec. Co.*, 96 F.3d 1544, 1553 (3d Cir. 1996), can constitute extraordinary circumstances.

Accordingly, to maintain a federal equitable estoppel claim in the ERISA context, the party asserting estoppel must not only meet the traditional equitable estoppel requirements, but must also allege: (1) extraordinary circumstances; (2) "that the provisions of the plan at issue were ambiguous such that reasonable persons could disagree as to their meaning or effect"; and (3) that the representations made about the plan were an interpretation of the plan, not an amendment or modification of the plan. *Spink v. Lockheed Corp.*, 125 F.3d 1257, 1262 (9th Cir. 1997) (citing *Pisciotta*, 91 F.3d at 1331); *see also Greany*, 973 F.2d at 822 n.9 ("A plaintiff must first establish that the plan provision in question is ambiguous and the party to be estopped interpreted this ambiguity. If these requirements are satisfied, the plaintiff may proceed with the equitable estoppel claim by satisfying" traditional equitable estoppel requirements.).

Third, "appropriate equitable relief" also includes "surcharge." As explained in *Amara*, "[e]quity courts possessed the power to provide relief in the form of monetary 'compensation' for a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment." 131 S. Ct. at 1880 (quoting Restatement (Third) of Trusts § 95, and Comment *a* (Tent. Draft No. 5, Mar. 2, 2009) (hereinafter Third Restatement)). "Indeed, prior to the merger of law and equity this kind of monetary remedy against a trustee, sometimes called a 'surcharge,' was 'exclusively equitable.'" *Id.* (quoting *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 464 (1939)). This remedy "extended to a breach of trust committed by a fiduciary encompassing any violation of a duty imposed upon that fiduciary." *Id.* Because *Amara* involved "a suit by a beneficiary against a plan fiduciary," *id.* at 1879, and it was within the power of traditional equity courts to grant a demand for "make-whole

relief" in the form of the equitable remedy of surcharge, such a remedy was available to the beneficiaries in *Amara*, *id.* at 1880. The Court therefore distinguished *Mertens*, *id.*, in which the plan participants had sued a defendant who was not a trustee, 508 U.S. at 250, 262–63. Because such a lawsuit would fall outside of traditional equitable jurisprudence, the "make-whole relief" in that case constituted compensatory damages against a nonfiduciary, which "traditionally speaking, was legal, not equitable, in nature." *Amara*, 131 S. Ct. at 1878; *see also id.* at 1880 ("Thus, insofar as an award of make-whole relief is concerned, the fact that the defendant in this case, unlike the defendant in *Mertens*, is analogous to a trustee makes a critical difference."). *Amara* further noted that equity courts did not require "a showing of detrimental reliance" when ordering surcharge. *Id.* at 1881. "Rather, they simply ordered a trust or beneficiary made whole following a trustee's breach of trust," and would "mold the relief to protect the rights of the beneficiary." *Id.* (internal quotation marks omitted). Accordingly, *Amara* concluded that "to obtain relief by surcharge" for a breach of the ERISA trustee's duties, "a plan participant or beneficiary must show that the violation injured him or her," but "need only show harm and causation," not detrimental reliance. *Id.*

We followed the traditional equitable principles and treatises relied on in *Amara* in our subsequent decision in *Skinner*, where we held that surcharge may be an appropriate form of equitable relief to redress losses of value or lost profits to the trust estate and to require a fiduciary to disgorge profits from unjust enrichment. 673 F.3d at 1167. In *Skinner*, participants in a retirement plan claimed that the committee administrating the plan breached its statutory duty to provide them with a summary plan document that was "sufficiently accurate and comprehensive" to inform them of

their rights, duties, offsets, and reductions. *Id.* According to *Skinner*, "the remedy of surcharge could hold the committee liable for benefits it gained through unjust enrichment or for harm caused as the result of its breach" of such a statutory duty. *Id.*

First addressing unjust enrichment, we held that "[a] trustee (or a fiduciary) who gains a benefit by breaching his or her duty must return that benefit to the beneficiary." *Id.* (citing Restatement (Third) Trusts § 100(b) (2012); Restatement (Second) Trusts § 205 (1959); Restatement (Third) Restitution & Unjust Enrichment § 43 (2011); Restatement (First) Restitution § 138 (1937)). We concluded that the participants were not entitled to disgorgement of profits from unjust enrichment because they "presented no evidence that the committee gained a benefit by failing to ensure that participants received an accurate [summary plan description]." *Id.*

We then addressed "[c]ompensatory damages for actual harm," and stated that "[a] trustee who breaches his or her duty could be liable for loss of value to the trust or for any profits that the trust would have accrued in the absence of the breach." *Id.* (citing Restatement (Third) Trusts § 100(a) (2012); Restatement (Second) Trusts § 205 (1959)). More generally, "[t]he beneficiary can pursue the remedy that will put the beneficiary in the position he or she would have attained but for the trustee's breach." *Id.* Applying these principles, we concluded that the participants were not entitled to compensatory relief because they did not suffer any compensable harm. *Id.* Accordingly, we concluded that the remedy of surcharge was not available to compensate the participants.

## B

We now turn to Gabriel's claim under § 1132(a)(3) that there is a genuine issue of material fact as to whether he is entitled to "appropriate equitable relief."[5]

## 1

We first consider Gabriel's argument that he is entitled to an order equitably estopping the Fund from relying on its corrected records that show his actual years of service.[6] Gabriel claims he meets the test for traditional equitable estoppel because: (1) the defendants were aware that he was not vested; (2) they nevertheless informed him in the January 7, 1997 letter that he would receive a monthly pension, and Gabriel was entitled to rely on this letter; (3) Gabriel was ignorant of the true facts; and (4) Gabriel relied on the misinformation in the January 1997 letter to his detriment by retiring at age 62 when he could have continued working. Further, Gabriel asserts that he has met the additional requirements set forth in *Spink*, because the provisions of the Plan were ambiguous, the plan representative provided an

---

[5] We may address this issue before asking whether Gabriel has created a genuine issue of material fact that the Fund violated the fiduciary duties set forth in § 1104(a)(1)(A) and (B). *See Mertens*, 508 U.S. at 254–55 (evaluating whether the relief sought constituted "appropriate equitable relief" and reserving decision on whether "a remediable wrong has been alleged").

[6] Gabriel's request for relief has changed over the course of this litigation. In his complaint, Gabriel asserted that the defendants should be estopped from denying that he qualified as a vested participant in the Plan. Because he now concedes that he did not vest in the Plan, he instead asserts that the defendants should be estopped from refusing to change the Fund's records to show him as vested.

interpretation of the Plan, and there were extraordinary circumstances, including that the defendants operated under a conflict of interest and violated the procedural requirements of ERISA.

We need not determine whether Gabriel has raised a genuine issue of material fact as to every element of his equitable estoppel claim because we conclude that Gabriel has failed to show that the plan representative's January 1997 letter was an interpretation of ambiguous language in the Plan, rather than a mere mistake in assessing Gabriel's entitlement to benefits. On its face, the letter does not provide an interpretation of the Plan, but merely provides the erroneous information that Gabriel is entitled to benefits of $1,236 per month upon retirement. Such an error in calculating benefits is just the sort of mistake that we repeatedly have held cannot provide a basis for equitable estoppel. We have made clear that "[a] plaintiff cannot avail himself of a federal ERISA estoppel claim based upon statements of a plan employee which would enlarge his rights against the plan beyond what he could recover under the unambiguous language of the plan itself." *Greany*, 973 F.2d at 822; *see also Renfro v. Funky Door Long Term Disability Plan*, 686 F.3d 1044, 1054 (9th Cir. 2012) (holding that "a beneficiary cannot obtain recovery on the basis of estoppel 'in the face of contrary, written plan provisions'" (quoting *Davidian*, 859 F.2d at 134)). "Our precedent dictates that a trust fund can never be equitably estopped where payment would conflict with the written agreement." *Greany*, 973 F.2d at 822. Nor is this principle limited to trust fund defendants, because we concluded in *Greany* that "no compelling reason [existed] to allow an estoppel claim to proceed solely because the individual or group to be estopped is other than a trust." *Id.*

To counter the weight of this precedent, Gabriel relies on *Spink*, and claims that the type of misinformation he received from the plan representatives, when considered in conjunction with various provisions in the Plan, makes certain provisions in the Plan ambiguous as to him. To understand this argument, we must first take an in-depth look at *Spink*. In *Spink*, Lockheed hired the plaintiff, who was then 61 years old, away from a competitor. 125 F.3d at 1259. As part of its recruitment process, Lockheed represented that the plaintiff could participate in Lockheed's pension plan. *Id.* For the next four years, Lockheed sent the plaintiff written year-end statements notifying him of the amount of credited service he had accumulated as a plan participant. *Id.* Eventually, Lockheed notified him he was not eligible to participate in the plan because he was over 60 when hired. *Id.* at 1259–60. Although the district court granted Lockheed's motion to dismiss, *id.* at 1259, we reversed, rejecting Lockheed's argument that the pension plan unambiguously excluded the plaintiff from obtaining benefits, *see id.* at 1262–63.

In reaching that conclusion, we relied on two provisions of Lockheed's ERISA plan. The first provision stated that "no Employee may become a Member if he commences employment on or after December 25, 1976, and, at the time of such commencement of employment, is sixty (60) years of age or older." *Id.* at 1262. The second provided that "once each year the Retirement Plan Committee shall notify each Member in writing of his total Credited Service, according to the Corporation's records. Such Credited Service shall be considered *correct* and *final* unless the Member files an objection by Filing With the Committee within thirty (30) calendared days following such notice." *Id.* Because the plaintiff had received "*correct* and *final*" year-end statements indicating that he had accrued credited service time, despite

having been older than sixty when hired, we concluded there was sufficient ambiguity in the plan as applied to the plaintiff to allow the case to survive Lockheed's motion to dismiss. *Id.* at 1262–63.

Gabriel claims he is similarly situated to the employee in *Spink*, and points to two different provisions in the Plan. First, he identifies the "unambiguous statement in the AEPF plan that ten years of service are required." This ten-year vesting requirement is reflected in both section 5.01,[7] which sets the normal retirement date, and section 8.03,[8] entitled "vesting," which explains when a terminated participant will

---

[7] Section 5.01(a) provides in relevant part:

> The Normal Retirement Date for a Participant shall be the first day of the month coincident with or immediately following his attainment of age 62, or one year after his Effective Date of Coverage, whichever is later and the date he has:
>
> (a) completed ten (10) Years of Service, of which at least one year must be Credited Future Service . . . .

[8] Section 8.03 provides in relevant part:

> A Participant who prior to January 1, 1978, fails to earn a total of at least 500 Hours of Service in a two-consecutive Plan Year period and a Participant, who on or after January 1, 1978, fails to earn at least 500 Hours of Service in a Plan Year shall be deemed a Terminated Vested Participant provided he has completed ten (10) or more Years of Service, of which one year was Credited Future Service. Once he attains age 55, he shall be eligible to apply for a Retirement Income in accordance with the applicable provisions of Article VII[, which sets the amount of retirement income].

be considered to have vested. Second, section 14.02 states that participants in the Plan "shall be entitled to obtain periodic reports showing the number of hours credited to their accounts at the administration office" and may claim they are entitled to additional hours by filing a claim and evidence with the administration office within one year after the end of the disputed year. Otherwise the "hours shall remain as credited."[9] According to Gabriel, the Fund gave him an unequivocal written statement that he would be entitled to $1,236 per month if he retired in 1997, implicitly indicating that he had enough hours of service to vest. Gabriel reasons that, because he did not challenge the Fund's implicit indication that his service hours were sufficient for vesting, the "hours shall remain as credited" under section 14.02. Gabriel concludes that the clash between the Fund's implicit hours calculation in the representative's letter to him and the Plan's statement that ten years are required for vesting creates an ambiguity in the Plan's provisions.

We disagree. Section 14.02 refers only to "periodic reports showing the number of hours credited" to a participant's account. Gabriel does not claim he received or

---

[9] Section 14.02 states in pertinent part:

> Participants shall be entitled to obtain periodic reports showing the number of house credited to their accounts at the administration office. Participants who contend that they are entitled to be credited with a greater number of hours for any calendar year must file evidence in support of such claims with the administration office within one year after the end of the disputed year or the hours shall remain as credited. The Trustees shall determine the proper number of hours, if any, to be credited to such Participants.

relied on such periodic reports when deciding to retire. Therefore, even if section 14.02's requirement that the hours in such a report "shall remain as credited" could create an ambiguity when read in connection with the vesting requirements in sections 5.01 and 8.03 under some circumstances, no such conflict exists in this case.

Because section 14.02 is not applicable to Gabriel's claims, we are left with his argument that the misinformation provided by the plan representative in 1997 conflicts with the clear language of sections 5.01 and 8.03. This conflict does not cast doubt on the meaning or effect of those sections, however, but merely establishes that the defendants made misrepresentations, a necessary element of traditional estoppel. Reasonable persons could not disagree regarding the effect of sections 5.01 and 8.03. The plan representative's mistaken response to Gabriel's inquiry therefore "does not rise to the level of an interpretation of the plan's provisions justifying application of the equitable estoppel doctrine." *Greany*, 973 F.2d at 822.

Even if Gabriel could show that the Plan was ambiguous, he fails to satisfy another element necessary to qualify for equitable estoppel: that he was ignorant of the true facts. Gabriel does not dispute that he received the Fund's November 20, 1979 letter. This letter informed Gabriel that he had not been eligible to participate while a proprietor of Twin Cities between 1975 and 1978, that his hours accrued for Twin Cities would be deducted from his account, and that he had been terminated under section 8.01 of the Plan, which provides that a non-vested participant who, for any two consecutive plan years, has less than 500 hours of service will be deemed a terminated non-vested participant, absent reinstatement or some other exception. Gabriel argues that

this letter was insufficient to inform him he was not vested, because it did not expressly state that he was ineligible to receive a pension unless he met certain criteria. The letter itself belies this claim.[10] Accordingly, the district court properly concluded that Gabriel was not entitled to relief based on estoppel as a matter of law.

2

We next turn to Gabriel's claim that he is entitled to the equitable remedy of reformation. To qualify for reformation of the Plan based on mistake under trust or contract law principles, Gabriel would need to demonstrate that "a mistake of fact or law affected the terms" of the Plan, the relevant trust instrument here, and introduce evidence of the trust settlor's (or contractual parties') true intent. *Skinner*, 673 F.3d at 1166. Gabriel cannot meet this standard as a matter of law, because the Plan itself does not contain an error. Gabriel concedes that he was a sole proprietor of Twin Cities from 1975 to 1978 and ineligible to participate in the Plan during that time, and therefore the Fund's current, corrected records accurately reflect the agreement between Gabriel and the Fund. Instead, Gabriel wants to reform the Fund's administrative records to conform to the misinformation provided by the plan representative. But reformation does not extend so far. The administrative records are not part of the Plan, *see Amara*, 131 S. Ct. at 1877–78 (rejecting the use of non-plan summary documents to create new or different plan terms), and the Fund's mistaken administrative records did not reflect the parties'

---

[10] Because the November 20, 1979 letter establishes that Gabriel knew or should have known that he was not vested, we do not need to reach his argument that he never received the December 3, 1979 letter.

true intent in entering into the Plan. Accordingly, the remedy of reformation due to mistake is not applicable in this context.

Nor has Gabriel demonstrated that he is entitled to reformation based on fraud, because he does not allege that the Plan "was procured by wrongful conduct, such as undue influence, duress, or fraud" or that he "was justified in relying on the [Fund's] misrepresentations." *Skinner*, 673 F.3d at 1166. Accordingly, Gabriel has not adduced evidence giving rise to a genuine issue of material fact that he is entitled to reformation.

Gabriel argues that our decision in *Mathews v. Chevron Corp.*, 362 F.3d 1172 (9th Cir. 2004), supports his reformation claim. In *Mathews*, Chevron management adopted a program to reduce its workforce by offering an enhanced retirement benefit to any participant in Chevron's ERISA plan who was involuntarily terminated without cause, including those employees who expressed an interest in such "involuntary" termination. *Id.* at 1176–77. Despite this program, plant general managers at first continued to exercise significant personnel discretion. The Richmond plant general manager repeatedly informed his employees that he did not plan to adopt the enhanced benefit program, and certain employees at the plant voluntarily retired. *Id.* at 1177. When Chevron ultimately instituted the program at Richmond, the retired employees sued for the enhanced benefits. *Id.* at 1177–78. It was undisputed that all of the employees would have been selected for involuntary termination had they expressed an interest. *Id.* at 1186. We held that Chevron breached its fiduciary duty to these employees once it began to seriously consider implementing the program in Richmond. Therefore, we affirmed the district court's order that Chevron had to modify its records to show that the retired plaintiffs

had been involuntarily terminated and were eligible for enhanced benefits. *Id.* at 1186–87. The remedy was "appropriate equitable relief" because it operated merely to provide the participants with the benefits they would have been received but for the breach. *Id.* (internal quotation marks omitted).

*Mathews* does not help Gabriel here. In *Mathews*, the employees had been eligible to participate in the enhanced benefits program, and would have participated but for the fiduciary's misinformation. *Id.* at 1186. Here, by contrast, Gabriel was not eligible to participate in the Plan, and the misinformation he received in 1997 from a plan representative did not prevent him from obtaining any benefit under the Plan to which he otherwise would have been entitled. Whereas the order in *Mathews* allowed the employees to get the benefit of the involuntary termination program, but did not alter the terms of the Plan as written, *see id.* at 1186–87, the order Gabriel seeks here necessarily would require violating the terms of the Plan by deeming an ineligible person to be eligible for pension benefits. Equitable remedies are not available where the claim "would result in a payment of benefits that would be inconsistent with the written plan." *Greany*, 973 F.2d at 822.

3

Finally, we turn to Gabriel's claim that he is entitled to the equitable remedy of surcharge, which he frames as entitlement to receive an amount equal to the benefits he would have received had he been a participant with the hours erroneously reflected in the Fund's records when he applied for benefits. Because the district court held that monetary relief was not available under *Mertens*, it did not consider

whether Gabriel's action was "a suit by a beneficiary against a plan fiduciary," *Amara*, 131 S. Ct. at 1879, for "a loss resulting from a trustee's breach of duty, or to prevent the trustee's unjust enrichment," *id.* at 1880, and thus constituted "appropriate equitable relief" for purposes of § 1132(a)(3)(B). Nor did the district court determine whether Gabriel had shown that the trustee's breach of duty injured him, *id.* at 1881, or whether "the remedy of surcharge" is available for the claimed injury, *see Skinner*, 673 F.3d at 1167 (applying traditional equitable principles to determine whether "the remedy of surcharge could hold the [plan administrator] liable for benefits it gained through unjust enrichment or for harm caused as the result of its breach"). In *Amara*, the Supreme Court held that where the district court had not determined "if an appropriate remedy may be imposed under § 502(a)(3)" the correct approach was to "vacate the judgment below and remand this case for further proceedings." 131 S. Ct. at 1882. We take the same approach here, consistent with our sister circuits. *See McCravy v. Metro. Life Ins. Co.*, 690 F.3d 176, 181–83 (4th Cir. 2012) (vacating the district court's summary judgment order because the court failed to recognize the availability of the surcharge remedy pre-*Amara*); *see also Silva v. Metro. Life Ins. Co.*, 762 F.3d 711, 724–25 (8th Cir. 2014) (same); *Kenseth v. Dean Health Plan, Inc.*, 722 F.3d 869, 870, 892 (7th Cir. 2013) (same).

### III

We now turn to Gabriel's argument under § 1132(a)(1) that the defendants erred in denying him benefits on the ground that he was non-vested. Gabriel does not claim that the Fund erred in determining that he had not vested in the Plan. Rather, he argues that the Fund waived this rationale

for denying him benefits because the Fund did not raise his non-vested status until 2004, three years after the Fund first suspended benefits on the ground that Gabriel was engaged in improper post-retirement work in the industry.

The Fund did not abuse its discretion here. Under ERISA, an employee benefit plan must "provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied" and must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim." 29 U.S.C. § 1133; *see also* 29 C.F.R. § 2560.503–1(g)(1), (h)(2). Given these statutory and regulatory requirements, we have held that an administrator may not raise a new reason for denying benefits in its final decision, because that would effectively preclude the participant "from responding to that rationale for denial at the administrative level," and insulate the rationale from administrative review. *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 974 (9th Cir 2006) (en banc); *see also Saffon v. Wells Fargo & Co. Long Term Disability Plan*, 522 F.3d 863, 871 (9th Cir. 2008) (holding that a plan administrator must provide a participant with the reasons for a benefits denial at a time when the participant "had a fair chance to present evidence on this point," and should not add a new reason in the administrator's final denial). Where the administrator's final denial contains a new rationale for denying a claim, the participant may present evidence on that point to the district court, which must consider it. *Saffon*, 522 F.3d at 872. Further, the district court can take into account the administrator's violation of ERISA's procedural requirements in determining how much deference to give the administrator's final decision. *Id.* at 873.

In this case, the Fund did not violate ERISA's procedural requirements because it notified Gabriel regarding his non-vested status while Gabriel's administrative case was still pending before the Appeals Committee.  The Fund did not put a new rationale for denying benefits into a final decision in a manner that would insulate the denial from administrative review.  *Cf. Abatie*, 458 F.3d at 974.  The Appeals Committee had not yet ruled on Gabriel's claim for benefits when it discovered his non-vested status, and nothing precluded Gabriel from further litigating the Fund's decision to deny him benefits through the Fund's administrative review process.  Indeed, Gabriel had the opportunity to present evidence to the Appeals Committee on this very issue, because the district court remanded his benefits claim to the Appeals Committee.  As we noted in *Saffon*, if a plan administrator fails to give timely notice, the plaintiff is not entitled to an award of benefits, but only to the opportunity to present evidence to challenge the plan administrator's new determination. *See* 522 F.3d at 872–74.  Gabriel got just such a remedy in this case.  Accordingly, we reject Gabriel's arguments that the Fund failed to comply with ERISA procedural requirements, or that it waived its determination that Gabriel never vested, and affirm the district court's deference to the Fund's denial of benefits.

## IV

We affirm the district court's determination that Gabriel is not entitled to equitable estoppel or reformation, as well as its holding that the Fund did not waive its argument that he never vested.  Because the district court did not have the benefit of *Amara*, we vacate its determination that the payment of benefits constituted compensatory damages and therefore the equitable remedy of surcharge was not

"appropriate equitable relief," 29 U.S.C. § 1132(a)(3)(B). On remand, the district court must determine whether the surcharge remedy is "appropriate equitable relief" in this context, and if so, whether Gabriel has alleged a remediable wrong, *see Mertens*, 508 U.S. at 254, that can survive the Fund's motion for summary judgment.

**AFFIRMED IN PART and VACATED AND REMANDED IN PART.**

KOZINSKI, Circuit Judge, concurring:

I don't object to the decision to remand so the district court may consider whether Gabriel is entitled to the equitable remedy of "surcharge" against the Fund under *CIGNA Corp.* v. *Amara*, 131 S. Ct. 1866 (2011). But on the record before us, I seriously doubt that Gabriel will prevail on such a surcharge claim consistent with our opinion.

Gabriel claims he's entitled to equitable relief from the Fund in the form of a surcharge, *see Amara*, 131 S. Ct. at 1880, because the Fund's inaccurate statements and payment of benefits he hadn't earned "induced Gabriel into an earlier retirement than he could afford." But we hold, in the course of affirming the district court's grant of summary judgment to the Fund on Gabriel's equitable estoppel claim, that Gabriel wasn't "ignorant of the true facts." Op. 28. Gabriel doesn't dispute that he received a letter from the Fund on November 20, 1979 informing him that he didn't meet the vesting requirements and would be terminated from the Plan. We find the letter sufficient to inform him that he wasn't vested. *Id.* at 28–29. Thus, Gabriel can't show that any

reliance on the Plan's representations was reasonable for purposes of his equitable estoppel claim. *See Renfro* v. *Funky Door Long Term Disability Plan*, 686 F.3d 1044, 1054–55 (9th Cir. 2012); *Spink* v. *Lockheed Corp.*, 125 F.3d 1257, 1262 (9th Cir. 1997).

I can't see how Gabriel could prevail on a surcharge claim based on the same theory—namely, that the Fund's representations induced Gabriel into an early retirement. Even assuming that someone in Gabriel's position—who isn't vested in the Plan and thus isn't entitled to benefits under the Plan—has standing to pursue such a claim against the Fund, surcharge requires "harm and causation," *Amara*, 131 S. Ct. at 1881. The claimed harm must be something more than the mere violation of a statutory right to accurate statements; otherwise, ERISA fiduciaries would be "strictly liable for every mistake." *Skinner* v. *Northrop Grumman Ret. Plan B*, 673 F.3d 1162, 1167 (9th Cir. 2012). In *Skinner*, we rejected a surcharge claim brought by retirement plan beneficiaries against the plan administrator because the beneficiaries couldn't show that they relied on the allegedly inaccurate summary plan description, and thus "establish[ed] no harm for which they should be compensated." *Id.*

Gabriel would distinguish *Skinner* on the ground that, unlike the *Skinner* plaintiffs, the Fund's mistakes allegedly "induced Gabriel into an earlier retirement than he could afford." But Gabriel's argument is based on the premise that he detrimentally relied on the Fund's representations, and we've already held that any such reliance was unreasonable for purposes of Gabriel's equitable estoppel claim. It would be anomalous indeed to find that Gabriel's *unreasonable* reliance on the Fund's inaccurate statements and payment of benefits that he hadn't earned—which we hold is insufficient

for an equitable estoppel claim—is a sufficient injury for a surcharge claim.

Nothing in *Amara* calls for such an outcome. In *Amara*, the Court considered the availability of surcharge as a remedy to redress damages caused by Cigna's significantly incomplete and misleading descriptions of its new employee retirement plan, which made at least some employees worse off. 131 S. Ct. at 1872–73, 1880. The Court stated that surcharge may be an appropriate remedy for these violations, even in the absence of detrimental reliance by individual employees. *Id.* at 1880–81. That's because, as the Court explained, injury and causation might be proven in other ways, such as by showing that the defendant's misrepresentations duped fellow employees in their assessments of the new plan, who would have notified others. *Id.* at 1881. But Gabriel hasn't made, and can't make, any such argument here. The only harm alleged by Gabriel resulted from his claimed personal reliance on the Fund's representations. We've already held that any such reliance was unreasonable. Regardless of the scope of the surcharge remedy contemplated in *Amara*, I can't imagine it extends to a reliance claim where the plaintiff was apprised of the true facts. A contrary conclusion would result in "injustice to the [Fund] or third parties," George Gleason Bogert et al., *The Law of Trusts & Trustees* § 861 (2014), and a form of strict liability for every mistake that's claimed to be relied on, even if the reliance was unreasonable.

Therefore, unless Gabriel claims some other harm on remand besides the harm that allegedly resulted from his reliance on the Fund's payment of benefits and incorrect statements, the Fund would be entitled to summary judgment on the issue of Gabriel's entitlement to a surcharge.