**Gene R. MONPER, Brett A. Lynch, and Mark C. Veturis, Plaintiffs,**

v.

**The BOEING COMPANY, et al., Defendants.**

Case No. 2:13–cv–01569–RSM.

United States District Court, W.D. Washington, at Seattle.

Signed May 13, 2015.

David Preminger, Keller Rohrback LLP, New York, NY, Gretchen S. Obrist, Erin Maura Riley, Keller Rohrback, Seattle, WA, for Plaintiffs.

Jeffrey S. Russell, Thomas E. Wack, Bryan Cave, St. Louis, MO, John J. Schoemehl, Bryan Cave, Santa Monica, CA, Deidra A. Nguyen, Ryan Paul Hammond, Littler Mendelson, Seattle, WA, for Defendants.

## ORDER GRANTING MOTION TO DISMISS AMENDED COM-PLAINT IN PART

RICARDO S. MARTINEZ, District Judge.

## I. INTRODUCTION

This matter comes before the Court upon Defendants' Motion to Dismiss Amended Complaint for Failure to State a Claim. Dkt. # 32. The Court heard oral argument on the Motion and has considered the briefs, supporting exhibits, and supplemental authority submitted by both parties. Being fully apprised and for the reasons set forth herein, the Court grants in part and denies in part Defendants' Motion to Dismiss.

## II. FACTUAL BACKGROUND

This case arises from misinformation about pension benefits communicated to Plaintiffs Gene Monper, Brett Lynch, and Mark Veturis, which allegedly induced them to transfer from the McDonnell Douglas Corporation ("McDonnell Douglas") in California to the Boeing Company ("Boeing") in Washington. Plaintiffs assert that in the autumn of 2007, they were collectively told seventeen times in six separate conversations by recruiters and human resources ("HR") personnel that their pension benefits would not change or be reduced upon transfer. When they did transfer, Plaintiffs discovered that their early retirement benefits would in fact be significantly reduced, contrary to their prior understandings but in accordance with the terms of written plan documents they received only after their move to Washington.

### A. Retirement Plans

Prior to transferring, all three Plaintiffs were members of United Automobile, Local 148, through which they were enrolled in and accrued benefits under Hourly West, f/k/a/ the Employee Retirement Income Plan of the McDonald Douglas Corporation (the "Hourly West Plan"). In December 2009, McDonnell Douglas merged into Boeing, which assumed sponsorship of the Hourly West Plan. Under this plan, participants with at least ten years of vesting service are eligible to receive early retirement benefits when re-

tiring as early as age 55. Participants who have attained 30 or more years of "Aggregate Benefit Service"—that is, years of benefit service earned under the Plan— receive unreduced benefits upon early retirement from age 55. If fewer than 30 years of Aggregate Benefit Service have been attained, early retirement benefits at ages 55—61 are paid at a reduced level, and then in full from age 62. In addition, participants who have attained 30 years of Aggregate Benefit Service receive an "Early Retirement Supplement" ("ERS") when retiring at age 55 in the amount of $550 per month through age 62½. *See* Amended Complaint ("FAC"), Dkt. # 25 at ¶¶ 31–43.

All three Plaintiffs moved from McDonnell Douglas in Long Beach, California to Washington to begin employment with Boeing prior to attaining 30 years of Aggregate Benefit Service. Upon transfer, Plaintiffs were enrolled in the Boeing Company Employee Retirement Plan ("BCERP"), a defined benefits pension plan that provides a different early retirement benefits option. Under the BCERP, participants with at least 10 years of qualifying vesting service may retire as early as age 55. From ages 55 through 59, benefits are paid only at a reduced level, with a participant's benefits reduced by 2% per year for each year prior to age 60. For example, an employee retiring at age 55 would only receive 90% of his or her normal retirement benefits. *See* FAC at ¶¶ 44–51.

All three Plaintiffs are projected to have attained at least 10 years of qualifying

benefit service under the BCERP by age 55, entitling them to obtain reduced early retirement benefits in addition to those they are still entitled to receive under their Hourly West Plans. Plaintiffs will not, however, be eligible to receive unreduced early retirement benefits under the Hourly West Plan. It is undisputed that the terms of the written Hourly West Plan are clear in not allowing beneficiaries to continue to accrue benefits upon transferring to the BCERP.[1] FAC at ¶¶ 266, 303, 338. To this extent, Plaintiffs assert that it was only made known to them that they would be enrolled in BCERP after they moved to Washington, such that they could not have consulted the Plan documents in making their transfer decisions and instead relied on communications with HR representatives and recruiters.

As a result of their transfer and the limitations on dual accrual, Plaintiffs allege that they will face significantly diminished total benefits in early retirement as compared to what they would have received under the Hourly West Plan had they continued to accrue qualifying service. All three Plaintiffs would have obtained at least 30 years of Aggregate Benefit Service by age 55 had they remained under the Hourly West Plan, entitling them to full early retirement benefits and ERS payments. Plaintiffs estimate that they will lose between $1,284.61 and $2,166.06 per month, respectively, in early retirement benefits as a result of their transfer, with the exact amount dependent on their selected age of retirement and the method

---

1. The Hourly West Plan Summary Plan Description, which Plaintiff Veturis alleges he was specifically shown by a pension representative (FAC at ¶ 313), does allow for participants to continue to accrue Aggregate Benefit Service during years of service completed as a participant in "certain other Boeing-sponsored retirement plans." Dkt. # 41–4, p. 15.

Plaintiffs allege that they learned only after their transfer that they would be placed into the BCERP and discovered that the BCERP does not allow for continuing accrual of service time under the Hourly West Plan several years later when they sought to clarify pension benefits.

of benefits calculation. *See* FAC at ¶¶ 246, 293, 322.

## B. Communications of Misinformation

In 2007, Boeing was in severe need of employees at its Seattle-area facilities to assist in the delayed rollout of its Dreamliner aircraft. Plaintiffs assert that Boeing sent high-level recruiters from Seattle to Long Beach "with a mandate to get employees to move to Washington and to do whatever it took to get them there." FAC at ¶ 72. As part of this mandate, Plaintiffs assert that Boeing imposed quotas on the number of experienced employees that recruiters were required to induce. *Id.*

Recruiters Gary Irons, Mike Query, Kim Martin, and Tommy Small, and HR representative Cindy Cuto are each alleged to have separately communicated to Plaintiffs that their early retirement benefits would be unaffected by their transfers. For instance, Defendant Irons, Senior Manager of Production Flight Test Operations, told Monper and others in attendance at a 2007 Long Beach job fair that they would have "nothing to lose" by moving to Seattle and that their early retirement benefits would "not change or be affected." *Id.* at ¶ 121A. Recruiting Specialist Martin and Boeing Senior Manager Small are alleged to have silently acquiesced in these statements. *Id.* at ¶¶ 142A, 153A. Later that autumn, Defendant Irons, together with Manager of Flight Test Operations, Defendant Mike Query, interviewed Lynch for a flight mechanic position at a separate Boeing job fair. Despite the fact that Hourly West does not permit dual accrual for BCERP participants, Irons allegedly told Lynch that he would "keep accruing time" under the Hourly West Plan upon his transfer and that his Hourly West benefits would "continue to grow" while he worked in Seattle. *Id.* at ¶ 121B. Defendant Query is

alleged to have silently acquiesced in these statements. *Id.* at ¶ 131A. Human Resources Representative Cindy Cuto, a McDonnell Douglas employee, was Lynch's HR representative in Long Beach and is alleged to have confirmed that his Hourly West benefits would "continue to grow" upon his transfer. *Id.* at ¶ 164.

Several unnamed HR representatives are also alleged to have uniformly assured Plaintiffs that they would continue to accrue early retirement benefits under the Hourly West Plan at the same time that they accrued benefits under the BCERP. For instance, Plaintiff Veturis alleges that he visited Boeing's pension office in Long Beach, where Defendant Jane Doe 1 told him that he would "not lose his 30 and out of 55" unreduced early retirement benefits if he transferred. *Id.* at ¶ 176A. While making these representations, she pointed to the 2006 Hourly West Plan Summary Plan Description, showing him a list of plans that would also count toward Hourly West Plan benefits accrual. Defendant Doe 1 incorrectly informed Veturis that he would be enrolled in Boeing's Pension Value Plan, one of the plans listed as allowing for dual accrual. *Id.* Defendant Doe 2 is alleged to have made similar misrepresentations to Monper upon his calling the Boeing benefits hotline. *Id.* at ¶ 188A.

## C. Fiduciary Status

Plaintiffs' Amended Complaint alleges fiduciary status with reference to each Defendant's role and responsibility within the Boeing pension benefits structure. For instance, Defendants Boeing and McDonnell Douglas, Plaintiffs' employers at the time the conversations took place, are alleged to have become fiduciaries by functioning as manager and administrator of the Hourly West Plan and the BCERP (collectively, the "Plans"). FAC at ¶¶ 69–81. Boeing, along with its McDonnell

Douglas subsidiary, is alleged to have either deliberately disseminated misinformation through its recruiters about pension benefits or caused them to make misleading communications. *Id.*

In addition to McDonnell Douglas and Boeing as sponsors of the Plans, Plaintiffs' Amended Complaint states claims against nearly forty individual and entity defendants, broken down into the following classes. The "Committee Defendants," consisting of the Employee Benefits Plan Committee of the Boeing Company (the "Committee") and its eights members, are named fiduciaries in charge of administering both the Hourly West Plan and the BCERP at the time the misrepresentations occurred. *Id.* at ¶ 107. Although none of them ever personally spoke with Plaintiffs, they are alleged to be responsible for all aspects of communication with Plan participants about their benefits and to have fiduciary monitoring responsibility over those who communicate about benefits on behalf of Boeing and McDonnell Douglas. *Id.* at ¶ 109. The "Director Defendants," consisting of the Boeing Company Board of Directors and thirteen of its members, are also alleged to be fiduciaries by virtue of their appointment authority over the Committee. *Id.* at ¶¶ 24–25, 211–214. The "Direct Communication Defendants," including five named recruiters and three unnamed HR personnel (Does 1–3), are alleged to have acquired functional fiduciary status by acting in the capacity of plan managers and administrators when they communicated to participants about the future of plan benefits in the context of Boeing's recruitment efforts. *Id.* at ¶ 119. Does 4–10, responsible for supervising and training Does 1–3, are alleged to be functional fiduciaries by virtue of their role in overseeing communication with Plan participants about benefits. *Id.* at ¶¶ 215–219. Finally, Defendant Scott Buchanan, the Director of Benefits Delivery for Boeing, is

alleged to be a named fiduciary of the Plans as designated "plan administrator" in charge of signing Plan tax forms. *Id.* at ¶ 224.

## III. PROCEDURAL BACKGROUND

Plaintiffs brought this action on August 30, 2013 for fiduciary breach and failure to monitor under ERISA § 502(a)(3), for co-fiduciary liability under ERISA § 405(a)(1)-(3), and for attorney's fees and costs under ERISA § 502(g)(1). On March 28, 2014, the Court entered an Order granting Defendants' Motion to Dismiss Plaintiffs' original complaint with leave to amend. Dkt. # 24. The Court therein found unpersuasive Defendants' arguments that Plaintiffs' complaint should be dismissed because the claims were not ripe for resolution, because Plaintiff Lynch had failed to exhaust his administrative remedies, and because Plaintiffs improperly stated a claim for benefits disguised as one for breach of fiduciary duty. The Court did, however, find that Plaintiffs failed to plead that the alleged injuries were attributable to a Plan fiduciary acting in its fiduciary capacity, as required to state a § 502(a)(3) claim. The Court also dismissed with leave to amend Plaintiffs' three subsidiary ERISA claims for co-fiduciary liability, failure to monitor, and attorney's fees and costs, which it found to be dependent on an underlying ERISA violation.

Following the Court's Order of dismissal, Plaintiffs filed the instant 111 page Amended Complaint. *See* FAC. The Amended Complaint states claims against forty-one individual and entity defendants broken down into the classes detailed above. This operative complaint realleges four causes of action: (1) equitable relief pursuant to ERISA § 502(a)(3), (2) co-fiduciary liability pursuant to ERISA § 405(a), (3) failure to monitor pursuant to

ERISA § 502(a)(3), and (4) attorneys' fees and costs pursuant to ERISA § 502(g)(1).

Through the instant Motion to Dismiss, Defendants move the Court to dismiss all claims in the Amended Complaint against all Defendants with prejudice and without leave to amend. Dkt. # 32. Defendants assert that, despite its substantial length, the Amended Complaint fails to plead facts showing that the alleged misinformation was produced and disseminated by Boeing/McDonnell Douglas or by anyone acting in a fiduciary capacity. Defendants instead characterize the miscommunications as isolated instances attributable solely to low-level employees acting in purely ministerial—not fiduciary—roles. Defendants additionally assert that following the recent Ninth Circuit decision *Gabriel v. Alaska Elec. Pension Fund*, 755 F.3d 647 (9th Cir.2014), *superseded by* 773 F.3d 945 (9th Cir.2014), the equitable remedies that Plaintiffs seek are not available where they would result in payment of benefits inconsistent with the terms of the written plan. Defendants thus argue that, even if Plaintiffs successfully pled fiduciary breach, *Gabriel* effectively closed the door to a remedy in equity in cases such as the present.

### IV. STANDARD OF REVIEW

To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). A claim is facially plausible if the plaintiff has pled "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955). In making this assessment, the Court accepts all facts alleged in the Amended Complaint as true, and makes all inferences in the light most favorable to the non-moving party. *Barker v. Riverside County Office of Educ.*, 584 F.3d 821, 824 (9th Cir.2009) (internal citations omitted).[2]

■ Unlike in fraud cases, for which Rule 9(b) requires that claims be pled with particularity, heightened pleading is not required where plaintiffs allege breaches of ERISA fiduciary duties. *Concha v. London*, 62 F.3d 1493, 1502 (9th Cir.1995). This is so because "[w]here a fiduciary exercises discretionary control over a plan, and assumes the responsibilities that this control entails, the victim of his misconduct often will not, at the time he files his complaint, be in a position to describe with particularity the events constituting the alleged misconduct. These facts will frequently be in the exclusive possession of the breaching fiduciary." *Id.* at 1503.

■ The Court typically cannot consider evidence beyond the four corners of the complaint, but it may rely on documents referred to in the complaint when they are central to a party's claim and their authenticity is not in question. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir.2006). The Court may also consider evidence subject

---

**2.** Defendants have also suggested in their briefing that the Amended Complaint should be dismissed under Federal Rule of Civil Procedure 8 because of its excessive length. The Court declines to do so. While lengthy, Plaintiffs' Amended Complaint is pled with sufficient directness and clarity to provide Defendants notice of the claims asserted against them. *Cf. McHenry v. Renne*, 84 F.3d 1172 (9th Cir.1996) (affirming dismissal of prolix, confusing complaint that read like a press release).

to judicial notice. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir.2003). Here, the Court takes notice of the Hourly West Plan (Dkt. # 41–3) and Hourly West Plan Summary Plan Description (Dkt. # 41–4), both of which are incorporated into the Amended Complaint by reference.

## V. ANALYSIS

### A. Claim for Equitable Relief under ERISA § 502(a)(3)

#### 1. *Fiduciary Status*

■ To prevail on a claim for equitable relief under ERISA § 502(a)(3), a plaintiff must show that the defendant is an ERISA fiduciary acting in its fiduciary capacity and that the defendant violated an ERISA-imposed fiduciary obligation. *Mathews v. Chevron Corp.*, 362 F.3d 1172, 1178 (9th Cir.2004). The determination of fiduciary status is a threshold issue for a § 502(a)(3) claim and is to be determined by the Court as a matter of law. *Id.*

■ ERISA treats as a fiduciary those explicitly named as such in a plan, 29 U.S.C. § 1102(a)(1), as well as those who perform certain fiduciary functions regardless of official designation. Specifically, a person is treated as a "functional fiduciary" under ERISA if "he exercises any discretionary authority or discretionary control respecting management of such plan . . . or disposition of its assets" or if "he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A)(i), (iii). Individuals and entities can become functional fiduciaries by exercising fiduciary power even where they lack formal designation or authority to do so. *Yeseta v. Baima*, 837 F.2d 380, 386 (9th Cir.1988). While the definition of a functional fiduciary under § 1002(21) is "broad," it is not without limit, hinging on the exercise of discretionary control. *Id.*

at 385. For instance, an attorney or accountant does not qualify as a functional fiduciary because the provision of advice is distinct from exercising the necessary discretionary control over management of the plan or its assets. *Id.*

Here, Defendants allege that none of the individual or entity Defendants named in the Amended complaint satisfy the definition of an ERISA fiduciary. This Order considers each class of Defendants in turn.

#### a. *Direct Communication Defendants and Does 4–10*

■ First, Defendants assert that the "Direct Communication Defendants" (Recruiters Irons, Martin, Small, Query, and Cuto, as well as HR representatives Does 1–3) and Does 4–10 (alleged to have supervised and trained the Direct Communication Defendants) could not be ERISA fiduciaries because they are not Plan managers or administrators and lacked authority to function as such. While acknowledging that none of these Defendants are named fiduciaries, Plaintiffs contend that these Defendants transformed themselves into ERISA fiduciaries by carrying out the fiduciary function of communicating with Plaintiffs about their benefits.

■ The Court agrees with Defendants that the Direct Communication Defendants are not proper defendants in this action. Under Ninth Circuit law, the performance of "ministerial functions" is distinguishable from the "discretion to interpret provisions of the plan document[s] and to make final decisions" that is requisite to qualify as a functional ERISA fiduciary. *Chaganti v. Ceridian Benefits Services, Inc.*, 208 Fed.Appx. 541, 546 (9th Cir.2006) (citing *IT Corp. v. General American Life Ins.*, 107 F.3d 1415 (9th Cir.1997)). "Ministerial functions" include

"communicat[ing] with beneficiaries about their rights and options under the plan," which is the full extent of activity that the recruiters and HR representatives carried out in this case. *Id.* at 547 (internal quotations and alterations omitted); *see also Tocker v. Kraft Foods North America, Inc. Retirement Plan,* 494 Fed.Appx. 129, 131–32 (2d Cir.2012) (rejecting plaintiff's attempt to classify a "middle-manager" as a functional fiduciary because "no case law, statutory text, or regulation suggests that one acquires fiduciary status merely by communicating such information [about benefits]" to plan participants). The actions by these Defendants lack the hallmark exercise of discretionary authority or control that is necessary to trigger § 502(a)(3) liability.[3] *See CSA 401(K) Plan v. Pension Prof'ls, Inc.,* 195 F.3d 1135, 1138–40 (9th Cir.1999) (dismissing defendant that "lacked discretionary authority or control over the management and administration of the Plan"); 29 C.F.R. § 2509.75–8(D–2) (providing that persons are not fiduciaries with respect to a plan if they lack power to make plan decisions and instead perform administrative functions such as calculating benefits and advising participants of their rights and options under a plan). So too, Plaintiffs make no showing that Does 4–10 exercised the requisite discretionary control over the Plans by merely supervising or training HR personnel.

Plaintiffs' contention that interpretation of Plan documents necessarily involves something more than ministerial activity is unavailing. The cases to which Plaintiffs cite for this proposition involved fraudulent schemes orchestrated by employers to persuade plan participants to make decisions about whether to remain with a plan through the dissemination of inaccurate information. *See Varity Corp. v. Howe,* 516 U.S. 489, 116 S.Ct. 1065, 134 L.Ed.2d 130 (1996); *Mathews,* 362 F.3d 1172, 1178 (9th Cir.2004). The Supreme Court in *Varity Corp. v. Howe,* a case heavily relied on by both sides to this case, addressed the question, not at issue here, of whether a corporate employer was wearing its plan administrator hat when performing acts such as conveying information about plan benefits and interpreting plan terms. *Id.* at 502–504, 116 S.Ct. 1065. *Varity* stands for the proposition that one who is in a position to act as a functional fiduciary (such as the company itself) may be deemed to be acting in its fiduciary capacity when it interprets plan terms. It does not stand for Plaintiffs' proposition that a ministerial employee could unintentionally transform herself into a plan fiduciary merely by communicating about plan benefits. *See, e.g., Kannapien v. Quaker Oats Co.,* 507 F.3d 629, 639 (7th Cir.2007) (holding that neither plan manager nor human resources manager acted as plan fiduciary in discussing early retirement benefits with employees); *Schmidt v. Sheet Metal Wokers' Nat'l Pension Fund,* 128 F.3d 541, 547 (7th Cir.1997) (opining that benefits analyst did not act as functional plan fiduciary in advising pension plan participants how to designate beneficiary). Consistent with this reasoning, the Court in *Varity* held only that the corporation itself could be liable as a fiduciary, not those individual employees delivered the misleading messages.

Defendants' position also makes sense from a policy perspective. ERISA liability would be seemingly extended beyond via-

---

**3.** Plaintiffs also provide no authority for the position that employees, such as Mike Query, who lacked discretionary authority or control over plan management and administration, could incur ERISA liability by silently acquiescing to the statements of another low-level employee.

bility if any human resources employee could suddenly become liable for unintentionally communicating misinformation about benefits that are disallowed by Plan terms. Plaintiffs' position would essentially permit a recruiter to elevate herself or himself to the position of Plan administrator simply by speaking about the Plan, with all the responsibility and liability that doing so would entail. As this position has been roundly rejected by those courts that have considered it, the Direct Communication Defendants shall be dismissed from this action.

### b. *Director Defendants and Scott Buchanan*

■ Defendants do not contest that the Director Defendants and Scott Buchanan are Plan fiduciaries. Nonetheless, the Amended Complaint states claims against these Defendants only for their role as co-fiduciaries and for failure to monitor. *See* FAC at ¶ 342. Co-fiduciary and failure to monitor are derivative claims that necessarily fail where there is no underlying violation. *See* Dkt. # 24 at p. 12; *Andersen v. DHL Ret. Pension Plan,* 2012 WL 5389141 at *5 (W.D.Wash.2012) (dismissing derivative counts after dismissing principal ERISA claim). Consequently, the Court first determines whether an underlying ERISA § 502(a)(3) claim survives before turning to the causes of action asserted against these Defendants.

### c. *Committee Defendants*

Plaintiffs are correct that the Employee Benefits Plans Committee (the "Committee"), as a named fiduciary, may be a proper defendant. *See* FAC at ¶ 12 (alleging that the Committee is Plan Administrator of both the Hourly West Plan and BCERP); Hourly West Plan, Dkt. # 41–3, at ¶ 7.1 (charging the Committee with establishing bylaws and rules for the admin-

istration of the Hourly West Plan); *id.* at ¶ 7.2 (specifying the responsibilities of the Plan Administrator). So too, its members, to the extent that they carried out fiduciary functions as alleged by Plaintiffs (*see* FAC at ¶ 114), may be liable for fiduciary breaches. *Stewart v. Thorpe Holding Co. Profit Sharing Plan,* 207 F.3d 1143, 1156 (9th Cir.2000) (Where "a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company."). The question then is whether these Defendants should be held liable for the miscommunication by recruiters and HR personnel, where none of the Committee Defendants is alleged to have ever personally spoken with Plaintiffs. The Court answers this question by addressing in turn each of Plaintiffs' three theories for holding Committee Defendants liable.

■ First, the Court rejects Plaintiffs' theory that the Committee Defendants are directly liable for miscommunications by ministerial employees, where the Committee Defendants are not alleged to have played any direct role in the production or dissemination of the misleading communications. Plaintiffs nowhere allege that the Committee Defendants "authorized, participated in, or had knowledge of [the Communication Defendants'] misstatement[s]," or that they deliberately withheld information from recruiters and HR personnel about the consequences of Plaintiffs' contemplated transfer for the early retirement benefits. *Schmidt,* 128 F.3d at 547 (dismissing plan fiduciary that did not make the misstatement on which the plaintiff's fiduciary claim was based). As such, Committee Defendants' role in this case is distinguishable from that of the defendant plan administrator in *Varity,* which itself directed the provision of misleading com-

munications through individuals authorized as fiduciaries to make such communications. *Varity Corp.,* 516 U.S. at 502–03, 116 S.Ct. 1065; *see also In re Unisys Corp.,* 57 F.3d 1255, 1264–65 (3d Cir.1995) (finding breach of fiduciary duty claim established where fiduciary "affirmatively and systematically" misrepresented scope of retirement benefits to its employees).

 Second, the law is clear that the Committee Defendants cannot be held liable on the basis of *respondeat superior* for misrepresentations by the recruiters and HR personnel, even if these ministerial employees were agents acting under the supervision of the Committee, as Plaintiffs allege.[4] *See* FAC at ¶¶ 103, 116. As the Court has previously explained, *see* Dkt. # 24 n. 1, the Ninth Circuit has plainly signaled that common law theories, such as *respondeat superior,* are not to be imported into ERISA actions so as to expand the bases for liability that the statute provides. *See, e.g., Carr v. Int'l Game Tech.,* 770 F.Supp.2d 1080, 1090 (D.Nev.2011) ("The Ninth Circuit has found that a theory of *respondeat superior* in ERISA cases is inconsistent with the core principle of ERISA ....") (citing *Gelardi v. Pertec Computer Corp.,* 761 F.2d 1323, 1325 (9th Cir.1985), overruled on other grounds by *Cyr v. Reliance Standard Life Ins. Co.,* 642 F.3d 1202 (9th Cir.2011)); *Tool v. Nat'l Emp. Ben. Serv.,* 957 F.Supp. 1114, 1121 (N.D.Cal.1996) (explaining that the Ninth circuit "sent a clear signal that expansion of ERISA actions through the application of common law doctrines should be avoided") (internal quotations omitted). Other circuits are in accord. *See, e.g., Kannapien,* 507 F.3d at 640 ("Finding that Plan administrators may breach a fiducia-

ry duty vicariously through the actions of a non-fiduciary would vitiate our requirement that an ERISA claim for breach of a fiduciary duty must be asserted against plan fiduciaries."); *Kenseth v. Dean Health Plan,* 610 F.3d 452, 465 (7th Cir. 2010) (declining to find plan administrator liable on the basis of respondeat superior).

 Nonetheless, Plaintiffs' final theory, premised on the Committee's failure to act rather than its role in affirmatively misrepresenting benefits, merits greater consideration. Plaintiffs assert that their fiduciary breach claims against the Committee Defendants survive because these fiduciaries failed to fulfill their duty to provide Plaintiffs with complete and accurate information about the effect of transferring on their retirement benefits. To this extent, Plaintiffs are correct that an ERISA fiduciary may be held liable not only for disseminating materially misleading information, but also for failing to affirmatively provide material benefits information, whether on its own accord or when prompted by a participant's inquiry, in the event of a nonfiduciary's misrepresentation. *See Schmidt,* 128 F.3d at 548; *Kenseth,* 610 F.3d at 466 (providing that a fiduciary's duty to disclose material information under ERISA includes a negative bar against misleading plan participants as well as an "affirmative obligation to communicate material facts affecting the interest of beneficiaries"); *Eddy v. Colonial Life Ins. Co. of Am.,* 919 F.2d 747, 750 (D.C.Cir.1990); *Farr v. U.S. West Communications, Inc.,* 151 F.3d 908, 914 (9th Cir.1998) (holding that defendants breached their fiduciary duties by failing to explain negative tax consequences of participation in early retirement plan); *Barker*

---

4. To the extent that the Committee made a formal delegation of its fiduciary duties ERISA § 405(c) and § 7.5 of the Hourly West Plan, Plaintiffs concede that the Committee's role would be limited to that of monitoring, appointing, and co-fiduciary over its delegees. Dkt. # 41, p. 19.

v. Am. Mobil Power Corp., 64 F.3d 1397, 1403 (9th Cir.1995) (recognizing "obligation to convey complete and accurate information ... even when a beneficiary has not specifically asked for the information").

The Seventh Circuit articulated the contours of this omissions-based theory of liability in Kenseth v. Dean Health Plan, a case heavily relied upon by Plaintiffs. The court therein vacated the lower court's dismissal on summary judgment of claims for breach of fiduciary duty against the plan administrator based on a customer service representative's misrepresentation to a participant about her health care coverage. Although the court declined to extend liability to the phone operator who directly misinformed the plaintiff, it found that the plan administrator could be held liable for failing to provide complete information and make appropriate disclosures, particularly where it encouraged plan participants to call its customer service line with questions about coverage. Kenseth, 610 F.3d at 469. The Kenseth court distinguished those cases, like Schmidt, 128 F.3d 541, in which a plan administrator fulfills its fiduciary obligations by providing complete and unambiguous written information so as to ameliorate the detrimental consequences of a ministerial employee's accidental provision of misinformation:

> But by supplying participants and beneficiaries with plan documents that are silent or ambiguous on a recurring topic, the fiduciary exposes itself to liability for the mistakes that plan representatives might make in answering questions on that subject.... This is especially true when the fiduciary has not taken appropriate steps to make sure that ministerial employees will provide an insured with the complete and accurate information that is missing from the plan documents themselves.

Id. at 472. The Kenseth court thus found liable a plan administrator that "failed to take reasonable steps to ensure that participants like [plaintiff] understood that they could not rely upon the coverage advice of its customer service agents and knew where and how they could seek advice they could rely on." Id. (emphasis in original).

Other cases have expanded on the contours of a fiduciary's responsibility to provide "clear and accurate" information. In Eddy v. Colonial Life Ins. Co., for instance, the plaintiff called his insurance provider to inquire about continued or converted group health coverage upon the sale of his employer and was told only that continued coverage was not available, even though converted coverage was. 919 F.2d 747. Although the defendant disputed whether the plaintiff had asked about continued or converted coverage, the court concluded that the distinction was irrelevant. The court charged the defendant, as a fiduciary, with the duty to communicate all material facts and refused to "penalize[ ]" the plaintiff for not comprehending the "technical difference between 'conversion' and 'continuation.'" Id. at 751. The court also rejected the argument that the plaintiff should have continued to follow up to confirm his rights because the plaintiff "did not have a duty to try and try again until he received correct and complete information. Once the [plan participant] has made clear his situation, [the plan administrator] had a duty to provide the material information." Id. at 752.

Here, the Court finds that at this stage of the proceedings, Plaintiffs have sufficiently alleged the sort of ambiguity found in Kenseth and Eddy, which could give rise to liability for a fiduciary breach on the part of the Committee and its members as Administrator of the Plans. Plaintiffs do not dispute that had they known they

would be moved into the BCERP upon transfer, they could have verified with reference to the terms of the Plan documents that they could not have continued to accrue time toward unreduced early retirement benefits under the Hourly West Plan. *See, e.g.,* FAC at ¶ 266 ("Under the clear terms of the Hourly West Plan, what Boeing and certain Direct Communication Defendants had promised Monper was not possible."). The ambiguity lies in the lack of documentation provided to Plaintiffs specifying to which Plan they would belong upon transferring to Boeing. Absent information clearly responsive to this question, Plaintiffs relied on the word of the Direct Communication Defendants, including pension office and Total Access representatives allegedly overseen by the Committee, to fill in the informational void. FAC at ¶ 110.

The Committee did not have a duty to predict every way in which Plaintiffs' early retirement benefits could be affected upon an array of possible transfer circumstances. *See Farr,* 151 F.3d at 915. Nonetheless, Plaintiffs have pled facts sufficient to show that, as in *Kenseth,* the Committee failed to take appropriate steps to ensure that ministerial employees provided Plaintiffs with the complete and accurate information missing from the Plan documents themselves. *Kenseth,* 610 F.3d at 472. Upon receiving allegedly consistent answers from the appropriate representatives, Plaintiffs were not charged with the responsibility to "try and try again until [they] received correct and complete information." *Eddy,* 919 F.2d at 752. Whether the Committee Defendants fulfilled the duty that they did have to provide complete and unambiguous information, particularly in the face of repeated inquiries by Plaintiffs and other employees (*see, e.g.,* FAC at ¶ 268), presents questions of fact that cannot be answered at the motion to dismiss stage.

### d. *Boeing and McDonnell Douglas*

The Court must also consider whether Plaintiffs should be permitted to move beyond the pleading stage on their fiduciary breach claims against Boeing and McDonnell Douglas. The Amended Complaint's fiduciary breach claims against Boeing and McDonnell Douglas are premised on an array of alleged acts by the corporations, including their initiation and control over recruitment efforts, their generation of misinformation, and their failure to affirmatively disseminate accurate pension information prior to Plaintiffs making their decision whether to transfer. Plaintiffs also allege that Boeing and McDonnell Douglas set up and oversaw the pension offices, a representative of which communicated misinformation to Plaintiff Veturis, and encouraged Plan participants to take advantage of these human resources. According to Plaintiffs, the uniformity and repetition of the misleading information communicated to the individual Plaintiffs by different recruiters and HR representatives in different settings makes it "entirely plausible that the particular misinformation provided here originated with Boeing." Dkt. # 41, p. 15; FAC at ¶¶ 74–75, 89–90, 95–98.

Defendants contend that Plaintiffs' claims against these corporations are premised on a misguided attempt to shoehorn the instant case into the reach of *Varity* and *Mathews.* Defendants argue that Plaintiffs fail to plead the sort of "important company-wide 'blue top' announcement" that created liability for a corporate employer in *Mathews,* 362 F.3d at 1176. Nor, according to Defendants, do Plaintiffs plead the sort of "massive and outrageous fraud" (Dkt. # 43, p. 14) perpetrated by a corporate defendant in *Varity.* At the same time, Defendants present no

authority for the proposition that a corporate employer's liability hinges on the scale of the misrepresentations rather than on the employer's role in their production and dissemination.

The Court finds that Plaintiffs' Amended Complaint pleads sufficient facts giving rise to an inference that Boeing and McDonnell Douglas played a role in the production and dissemination of the misinformation. According to Plaintiffs, Boeing and McDonnell Douglas sent the recruiters to speak with Plaintiffs, catalyzed their conversations, imposed quotas on the numbers of employees recruiters were required to entice to Washington, and encouraged employees to consult representatives of a pension office and benefits hotline which the companies set up, staffed, and maintained. Boeing also appears to have benefitted from Plaintiffs' transfer, which allegedly helped fulfill a severe need for employees to assist in the delayed rollout of the Dreamliner aircraft. These facts, together with the repetitive and uniform nature of the misleading communications made to multiple employees on separate occasions, are sufficient to raise the reasonable inference that Boeing and McDonnell Douglas were responsible for the misconduct alleged. *Ashcroft*, 556 U.S. at 670, 129 S.Ct. 1937. The Court's decision to allow claims against these corporations to survive the motion to dismiss stage is also guided by the fact that neither *Varity* nor *Mathews* were decided prior to discovery. The Court is persuaded that Plaintiffs' case against Boeing and McDonnell Douglas should similarly be decided on its facts rather than its pleadings.

*2. Availability of Equitable Remedies.*

Defendants rely on *Gabriel v. Alaska Elec. Pension Fund*, 755 F.3d 647 ("*Gabriel I* "), for the proposition that equitable remedies are not available in this case. Although the *Gabriel I* panel vacated its original opinion and entered a new one following briefing in this matter, the case remains instructive.

After eleven years of receiving contributions on behalf of plaintiff Gabriel, the pension Fund discovered that because Gabriel was an employer and not an employee he was ineligible to receive retirement benefits. Although the Fund informed Gabriel in writing of its error and sent him a refund, a pension representative subsequently sent him a letter incorrectly informing him that he would receive $1236 per month in pension benefits upon his retirement. Relying on this latter communication, Gabriel retired and began collecting benefits only to be threatened some years later by the Fund for $81,033 in reimbursement for wrongfully paid benefits. He consequently brought an ERISA § 502(a)(3) action against the Fund alleging that it breached its fiduciary duties through the miscommunication.

Among several remedies, Gabriel sought the equitable remedy of surcharge to receive an amount equal to the benefits he would have received if he had been a participant with the hours erroneously reflected in the Fund's records when he applied for benefits. The Ninth Circuit panel initially rejected this claim, asserting that a beneficiary is entitled to restoration of a trust res by surcharging an unjustly enriched trustee, but it is not entitled to receive a benefit at the expense of other beneficiaries. *Id.* at 665. The panel also rejected Gabriel's claim for the equitable remedy of reformation, holding that "[e]quitable remedies are not available where the claim would result in a payment of benefits that would be inconsistent with the written plan." *Id.* (quoting *Greany v. Western Farm Bureau Life Ins. Co.*, 973 F.2d 812, 822 (9th Cir.1992)). The panel

thereby distinguished the case from *Mathews*, in which the misled employees were eligible to participate in an enhanced benefits program and would have so participated but for the fiduciary's misinformation. *Id.* By contrast, the plaintiff in *Gabriel I* sought to alter the terms of a plan as written, which the panel held is not permitted.

The superseding panel decision was nearly identical to the vacated one, except with respect to its consideration of the surcharge remedy. *See Gabriel v. Alaska Elec. Pension Fund,* 773 F.3d 945 (9th Cir.2014) ("*Gabriel II* "). As the panel retained its holding that reformation is not available to modify or contradict clear written plan terms, the Court assumes without deciding that Defendants are correct that equitable relief in the form of reformation is not available to Plaintiffs in this case. Even so, *Gabriel II* left open the availability of a surcharge remedy in a case such as the present, remanding the case to the district court to consider whether a surcharge remedy is available under the Supreme Court's decision in *CIGNA Corp. v. Amara,* 563 U.S. 421, 131 S.Ct. 1866, 1879, 179 L.Ed.2d 843 (2011).

Through its decision to remand, the *Gabriel II* panel recognized that monetary compensation may be available under § 502(a)(3) through a surcharge remedy in order to remedy losses to individual beneficiaries and permit them to be "made whole following a trustee's breach of trust," even if in contravention of written plan terms. *Gabriel II,* 773 F.3d at 958. To obtain relief by way of surcharge, a beneficiary must show a breach of fiduciary duties by an ERISA trustee, that the violation injured her or him, and that the remedy of surcharge is available for the claimed injury by reference to traditional equitable principles. *Id.* (quoting *Skinner*

*v. Northrop Grumman Retirement Plan B,* 673 F.3d 1162, 1167 (9th Cir.2012)); *see also id.* at 963 (remanding for the district court to determine whether Gabriel's action was " 'a suit by a beneficiary against a plan fiduciary,' for 'a loss from a trustee's breach of duty, or to prevent the trustee's unjust enrichment' and thus constituted 'appropriate equitable relief' for purposes of § 1132(a)(3)(B)") (quoting *Amara,* 131 S.Ct. at 1880).

Given the evolving state of equitable remedies in this Circuit, following the *Gabriel II* decision, the Court determines that the availability of the relief that Plaintiffs request is best addressed at the summary judgment stage. The Court has already found that Plaintiffs have sufficiently pled a breach of fiduciary duties by Boeing, McDonnell Douglas, and the Committee Defendants. Defendants do not dispute that Plaintiffs were injured by miscommunications, although they do dispute that the miscommunications are attributable to these Defendants. Plaintiffs have also pled facts sufficient for the Court to infer that Boeing was unjustly enriched by receiving the benefit of Plaintiffs' labor in its Seattle-area facilities. Following *Gabriel II,* the Court is persuaded that the availability of the surcharge remedy, as well as other possible equitable remedies, hinge on questions of fact that must be resolved upon discovery.

The Supreme Court suggested in *Amara* that it would be the rare case indeed in which a fiduciary breach causing injury to a Plan participant would be without redress. *See Amara,* 131 S.Ct. at 1879 ("[A] maxim of equity states that equity suffers not a right to be without a remedy") (internal quotations and alteration omitted); *contra Farr,* 151 F.3d at 917 (concluding that although defendants breached their fiduciary duties to plaintiffs, plaintiffs were not entitled to any of

the equitable remedies they sought under ERISA). In accordance with this guidance, the Court declines at this stage to find the door to equitable relief so firmly shut as to preclude redress should Plaintiffs prove Defendants liable for the losses they have suffered.

### B. Derivative Claims

The Amended Complaint also pleads claims for co-fiduciary liability, failure to monitor, and attorney's fees and costs. Defendants move to dismiss each of these claims because, as wholly derivative claims, they fail where there is no cognizable underlying violation. *See, e.g., In re Computer Sciences Corp. ERISA Litigation*, 635 F.Supp.2d 1128, 1144 (C.D.Cal. 2009) (dismissing monitoring claim because upon finding that underlying prudence claim failed); 29 U.S.C. § 1105(a) (providing grounds to hold a fiduciary liable for the breach of another fiduciary).

 Plaintiffs' claims for co-fiduciary liability are pled against all Defendants. *See* FAC at ¶ 360. Under any of the three types of co-fiduciary breach, all of which are pled in the Amended Complaint, a defendant must be itself a fiduciary to be held liable for the breach of another. *See Carr*, 770 F.Supp.2d at 1096–97 (listing elements for co-fiduciary breach claim under 29 U.S.C. § 1132(a)(1)-(3)). Because the Court has determined that the Direct Communication Defendants and Does 4–10 are not fiduciaries, Plaintiffs' claims for co-fiduciary breach against them are not cognizable and shall be dismissed. As to the Committee Defendants, Director Defendants, Boeing/McDonnell Douglas, and Scott Buchanan, Defendants make no argument to dismiss the co-fiduciary claims aside from their derivative nature. As the Court has found underlying fiduciary breach claims sufficiently pled to survive the Motion to Dismiss, the Court declines to dismiss Plaintiffs' claims for co-fiduciary liability against these classes of Defendants at this stage of the proceedings.

 Plaintiffs' claims for failure to monitor are brought solely against the Committee Defendants and the Director Defendants. Again, Defendants seek dismissal of these claims solely because of their derivative nature. For the reasons stated with respect to co-fiduciary liability, the Court also declines to dismiss Plaintiffs' failure to monitor claims at the pleading stage. As attorney's fees are ordinarily to be awarded where a Plan participant prevails in his suit to enforce his rights under the Plan, *Smith v. CMTA–IAM Pension Trust*, 746 F.2d 587, 589 (9th Cir. 1984), Plaintiffs' claim for attorney's fees and costs pursuant to ERISA § 502(g)(1) survives the Motion to Dismiss as well.

## VI. CONCLUSION

For the above-stated reasons, the Court hereby ORDERS that Defendants' Motion to Dismiss Amended Complaint for Failure to State a Claim (Dkt. # 32) is GRANTED in part and DENIED in part as follows:

(1) Defendants' Motion shall be GRANTED to the extent that it seeks dismissal of all claims pled against the Direct Communication Defendants (Gary Irons, Mike Query, Kim Martin, Tommy Small, Cindy Cuto, and Does 1–3) as well as Does 4–10. These Defendants shall be DISMISSED from this action without leave to amend, as the Court finds that amendment with respect to these ministerial Defendants would be futile.

(2) Defendants' Motion is DENIED in all other respects.